## COMMERCIAL STANDARD INS. CO. v. DAVIS.

### No. 8826.

Court of Civil Appeals of Texas. Austin.

Dec. 30, 1939.

Rehearing Denied Jan. 24, 1940.

Application for Writ of Error Dismissed March 6, 1940.

See 137 S.W.2d 1.

Todd, Crowley & Thompson, of Fort Worth, for appellant.

J. C. Darroch and E. M. Davis, both of Brownwood, for appellee.

BAUGH, Justice.

This is a Workmen's Compensation case. Appeal is from a judgment, based upon the jury's answers to special issues, in favor of appellee against appellant for $714 past-due installments, $471.50 for hospital, doctors, nurses, and medical bills, $6,660 to be paid in 333 weekly installments of $20 each. The Workmen's Compensation policy was issued to Daniel Baker College of Brownwood, Texas, by appellant insurance company. The appellant will hereinafter be referred to as the insurance company; Daniel Baker College as the college; and the appellee as Dr. Davis.

The first question presented is whether Dr. Davis was an employee of the college within the terms of the policy, and of the Workmen's Compensation Law; or was the president of that corporation and as such excluded from the benefits of the policy and of the Law. It is not controverted that Dr. Davis received serious bodily injuries in Mills County while said policy was in force and in the discharge of the duties of his employment.

A consideration of the first question presented requires an examination of the provisions of the charter of the college, the terms of the policy, the capacity in which Dr. Davis was employed, the duties he performed, and the terms of the Workmen's Compensation Law.

Daniel Baker College is a non-profit religious educational corporation. The original articles of incorporation, filed in the office of the Secretary of State on April 5, 1889, provided that this institution of learning should be owned and controlled by the Synod of Texas of the Presbyterian Church; that the authority of the Synod over the college be delegated to a board of 13 trustees elected by the Synod; and that, "This corporation shall provide for the election of such officers as it may deem necessary to transact the business of the corporation and further its objects and purposes; * * *." Subsequent thereto the charter of the college was variously amended, the last amendment being filed with the Secretary of State on September 9, 1932. Under and by virtue of this amendment the Synod of the Presbyterian Church relinquished all interest in and control over the college to the then board of trustees. It made that board a self perpetuating body; provided that said institution and its management should be conducted by the board of trustees; vested all properties and endowment in them in trust; and gave to the board all management, control and direction of the institution. No by-laws were ever promulgated, and nowhere in the articles of incorporation, nor in the charter amendments, do we find provision for any specific officers of the corporation other than the board of trustees. The office of president of Daniel Baker College is not shown to have ever been expressly created or specifically provided for.

It was not shown whether Dr. Davis had any written contract of employment with the board of trustees of the college or not. The minutes of the May 1, 1933, meeting of the board of trustees show that on motion duly made, "the Rev. Guy Davis was duly elected as president of Daniel Baker College." The minutes of July 17th showed that upon motion, "Dr. R. G. Davis as President of Daniel Baker College is hereby empowered to sign all papers executed in the name of the college which are authorized by the Board of Trustees."

It is not controverted that Dr. Davis was known as president of the college, was so listed in its catalogues and bulletins, signed diplomas as such along with the president and secretary of the board of trustees, contacted the public as such president, and signed written instruments executed by the college, but only under express authority of the board of trustees. On the other hand, however, he was not a member of the board of trustees, did not have authority to employ or discharge teachers, had no voice by virtue of his position in any action taken by the board, and was subject to being discharged at any time by the board. He was president of the faculty which also had its deans, registrar, etc. He, together with the faculty, had supervision of the courses of instruction and the teaching activities of the college. As between the faculty and the board of trustees he was the faculty representative, sat with the board at its meetings, and made

recommendations as to the operations of the college which were approved, modified, or rejected by the board as it saw fit. He was, notwithstanding his election as president of the college, subject to the supervision, control, and direction of the board in the discharge of the duties he was employed to perform. We attach no importance to the term "election" by the board as president of the college. It amounts, we conceive, merely to an employment for an indefinite period of time, and could as well have been evidenced by a written contract between himself and the board of trustees. The latter body had its own president, vice-president, and secretary-treasurer.

At the time Dr. Davis received his injuries he was returning from Austin where he had had a conference with the director of the National Youth Administration in Texas relative to the allotment and expenditure of federal funds in aiding needy students of the college, manifestly but an administrative duty in the operation of the school.

■ The policy written was on the standard form prescribed by the Board of Insurance Commissioners and manifestly designed primarily for the protection of employees of industrial corporations. It provided, among other things, that "all provisions of each Workmen's Compensation Law covered hereby shall be and remain a part of this contract as fully and completely as if written herein, * * *." One of the provisions of such law (Art. 8309, Sec. 1a, R.C.S.1925) relating to corporations is that: "The president * * * or other officers thereof provided in its charter or by-laws * * * shall not be deemed or held to be an employe within the meaning of that term as defined in the preceding section hereof, and this notwithstanding they may hold other offices in the corporation and may perform other duties and render other services for which they receive a salary."

The statute (Art. 8309, Sec. 1) provides that, " 'Employe' shall mean every person in the service of another under any contract of hire, expressed or implied, oral or written," etc. It is not controverted that Dr. Davis, at the time of his injury, was engaged in the discharge of a duty clearly within the scope of his employment.

■ Prior to the 1923 amendment to the Workmen's Compensation Law the courts had held that an officer of a corporation, who was also an employee within the terms of the Compensation Law, sustained a dual relationship to the corporation; and if injured in the capacity of employee, and not in the discharge of his duties as an officer, such injuries were compensable. Millers' Mutual Cas. Co. v. Hoover, Tex.Com.App., 235 S.W. 863; Cook v. Millers' Ind. Underwriters, Tex.Com.App., 240 S.W. 535. These decisions, however, were rendered prior to the 1923 amendment to the statute.

■ In Lumbermen's Reciprocal Ass'n v. Bohlssen, 272 S.W. 813, the Court of Civil Appeals at Beaumont held that the 1923 amendment was specifically intended to meet the interpretations made in the Cook and Hoover cases, and to deny insurance coverage to an officer of a corporation regardless of the capacity in which he was engaged at the time of his injury. Such holding was followed in Bell v. Tex. Employers' Ins. Ass'n, Tex.Civ.App., 43 S.W.2d 290. If Dr. Davis is to be deemed an employee only, and not an officer, of the corporation, he was protected by the policy. Or if, under all the facts and circumstances, the insurance company itself elected to treat him only as an employee, specifically insured and treated him as such, and charged and collected premiums for that purpose, can it now be heard to deny liability?

■■ No case has been cited to us, nor have we found one, wherein a non-profit religious educational institution was involved. The Workmen's Compensation Law was manifestly enacted to apply primarily to industrial corporations and for the benefit of the employees thereof. It is now settled that the law and the policies written thereunder must be liberally construed to effectuate its purposes. It is equally manifest that "employees" of an educational institution are of a different type and perform different duties from those of industrial corporations generally. The policy here involved should be construed in the light of the "employees" to whom it applied. The language of the policy itself as applicable to such "employees," and as evidencing the insurer's interpretation of its own liability, may be looked to.

■ The language of the policy itself expressly insured the president of the college, and included his remuneration in fixing the premium where "actually performing such duties as are ordinarily undertaken by a superintendent, foreman or work-

man." Under the "Classification of Operations," the principle coverage listed was "Professors, Teachers, or Professional Employees—Including Clerical Office Employees." It is clear that Dr. Davis' position with reference to the operations of the institution was that of a superintendent, or administrative executive. He had, by virtue of his position, no power of control over the official acts of the corporation as such, no authority to employ nor discharge anyone. He was, in his labors, entirely subject to the control and direction of the board of trustees, in whom had been vested by charter the complete and exclusive management, control and direction of the corporation, of its properties and of its employees. He could not, therefore, be deemed an employer, but was, we think, manifestly himself but a "Professional Employee" of the college within the meaning of the Compensation Law.

As above stated, there were no by-laws. The charter made no provision for the office of president of the corporation. The board of trustees had its own president, vice-president, and secretary-treasurer; but none of these had any part in actually conducting the educational work of the college. That work was delegated to the faculty and their assistants, employed for that purpose. Under these facts and circumstances, we think the designation of Dr. Davis as president of Daniel Baker College in its operation as an educational institution was, in legal contemplation, one of nomenclature only, not a creation of a legal status; and did not in law constitute him an officer of the corporation as a legal entity,—manifestly the official capacity contemplated by the legislature in the enactment of the Workmen's Compensation Law. With no office of president of the corporation created by charter or by-laws, and the control, management, and direction of the affairs of the corporation vested exclusively in the board of trustees of which he was not a member; and with his duties being only those of a supervisor, or administrative executive, he was not, we conclude, in legal contemplation an officer of the corporation as such within the meaning of the Compensation Law.

■ Appellant also contends that if Dr. Davis be not held to be an officer of the corporation, as a matter of law, then that the evidence raised the issue as an issue of fact, and such issue should have been submitted to the jury. This contention is not sustained.

There was in reality no dispute over the facts involved,—that is, the manner of his employment; his relationship to the college; his authority; nor the duties he performed. Under these circumstances, therefore, his legal status as an officer vel non was, we think, a question of law; and not a fact question for jury determination.

■ Appellant next contends that the finding of the jury that a previous injury sustained by Dr. Davis, which resulted in the loss of a foot, contributed nothing to his incapacity to labor, is so contrary to human experience that it should be set aside. This contention is not sustained. It is unnecessary to review the evidence on this issue. Suffice it to say that as to the character and type of work Dr. Davis was employed to do, and was qualified to do, the evidence was amply sufficient to show that his previous injury constituted no handicap to his performance thereof. Indeed, he had so effectively overcome the injury by the use of an artificial foot that his intimate friends did not know for years that he had it, and even then did not detect it in his walk, but were apprized of it otherwise.

■ Appellant's next contention is directed at the manner in which the amount of the "average weekly wages" of Dr. Davis was submitted to the jury. This question was submitted under the provisions of Sub. 3 of Sec. 1 of Art. 8309, R.S.,—that is, the jury were asked to determine the amount of such weekly wages in a manner "that would be fair and just to both the plaintiff and the defendant." Appellant's objection to this issue was that there were no pleadings and no proof that the weekly wages of Dr. Davis could not be determined under Subs. 1 and 2, Sec. 1 of Art. 8309; and it is here contended that it was necessary for appellee to first show by pleadings and proof that the provisions of Subs. 1 and 2 could not be followed before he was entitled to have this issue submitted under Sub. 3 of said article of the statute. Such, in general, is the rule announced in many cases. See American Employers' Ins. Co. v. Singleton, Tex. Com.App., 24 S.W.2d 26, 27; Traders' & Gen. Ins. Co. v. Bulis, 129 Tex. 362, 104 S. W.2d 488; 45 Tex.Jur., § 205, p. 650.

■ No exceptions were lodged against appellee's pleadings on this ground. The amount of his weekly wage was duly pleaded. The amount of such weekly wage was one of the ultimate issues of fact to be determined. The provisions of Subs. 1, 2

and 3, Sec. 1 of Art. 8309, are for the guidance of the Industrial Accident Board, and of the court, in the method and manner of how such ultimate issue is to be determined under the facts of the particular case. It was not, therefore, necessary for appellee to specifically plead the manner in which this fact should be ascertained. American Gen. Ins. Co. v. Richardson, Tex.Civ.App., 132 S.W.2d 161, writ refused.

█ It is not controverted that Dr. Davis was, and had been, employed on annual salary basis; that his compensation included monthly payments in cash, and rooms, board, etc., for himself, wife and one child, in a college dormitory; and that his remuneration, including the latter services, was valued at from $3,000 to $3,600 per year. These matters are not disputed. It is likewise not controverted that whatever method is used in computing the average weekly wage of Dr. Davis, the amount of his recovery authorized under the Compensation Law, and under the injuries found by the jury to have been sustained by him, would have exceeded the maximum $20 per week. No contention is made by appellant, even if the error asserted be conceded, that it suffered any injury thereby. Consequently, if error there was, it was manifestly harmless. See Southern Underwriters v. Jordan, Tex. Civ.App., 122 S.W.2d 260, wherein the exact question was involved.

█ █ Appellant's next contention must be sustained. The jury found that Dr. Davis' injury resulted in his total incapacity to labor for a period of 68 weeks; and that thereafter his incapacity was partial. Special Issue No. 6 submitted to the jury read as follows: "Do you find from a preponderance of the evidence that such partial incapacity to labor, if any such, is permanent?"

Following this the jury was instructed: "If you have answered Special Issue No. 6 'No,' and only in that event, you will answer Special Issue No. 7.

"Special Issue No. 7:

"What do you find from a preponderance of the evidence will be the duration of such partial incapacity, if any such? Answer in number of weeks."

The jury answered Special Issue No. 6 "Yes", and under the instructions given did not answer Special Issue No. 7.

Appellant objected to such submission in this manner on the ground that "said instruction results in a conditional submission to the jury of Special Issue No. 7, and plaintiff is entitled to an unconditional submission of Special Issue No. 7."

We do not understand appellee to contend that the issue of temporary partial incapacity was not raised by the pleadings and the evidence. Under the evidence the jury could have found that Dr. Davis' partial incapacity was not permanent. Appellee insists that the error, if any, was harmless, in that both the issues of total incapacity and of partial incapacity were unconditionally submitted; and that since the jury found that the partial incapacity was permanent no necessity existed for answering Special Issue No. 7. It is manifest that an answer to Special Issue No. 7 in a number of weeks less than permanent partial incapacity would have been inconsistent with the affirmative answer to Special Issue No. 6. It is also undoubtedly true that if Special Issue No. 7 had been submitted unconditionally, the jury would not, in all probability, after answering No. 6 in the affirmative, have answered No. 7 otherwise than as indicating permanent partial incapacity. But the exact question that where a defense is raised by the pleadings and the evidence, the defendant is entitled to have such defense submitted affirmatively and unconditionally, has been before the courts repeatedly, even in Workmen's Compensation cases, and is now so well established, that we are not at liberty to hold otherwise.

Whatever may have been differences of opinion and uncertainties arising from the decisions of the Courts of Civil Appeals on this question, it was specifically presented and definitely set at rest by the Supreme Court in Wright v. Traders & General Ins. Co., 123 S.W.2d 314. See also Texas Indemnity Ins. Co. v. Thibodeaux, 129 Tex. 655, 106 S.W.2d 268; Republic Underwriters v. Lewis, Tex.Civ.App., 106 S.W.2d 1113, wherein the exact question presented in the instant case was involved and the authorities thereon are collated.

For the error last above discussed, the judgment of the trial court must be reversed and the cause remanded for another trial.

Reversed and remanded.